691 A.2d 785

**Elliott Barton ARONSON**

v.

**Yudita Falk ARONSON.**

**No. 944, Sept.Term 1996.**

Court of Special Appeals of Maryland.

April 2, 1997.

John J. Condliffe (Shub–Condliffe & Condliffe, P.A., on the brief), Towson, for Appellant.

Steven M. Caplan, Towson, for Appellee.

Argued before MOYLAN, CATHELL and HOLLANDER, JJ.

HOLLANDER, Judge.

This contentious divorce case is perhaps best summarized by two maxims: "more haste, less speed" and "hindsight is 20/20." As we look back, it is evident to us that the parties prematurely proceeded to trial. Our decision to vacate the judgment of divorce is an unfortunate but unavoidable consequence of the proverbial "rush to judgment."

Yudita Falk Aronson, appellee, filed suit against Elliott Barton Aronson, appellant, seeking a divorce on the grounds of adultery and a two year separation.[1] When the trial commenced on December 14, 1995 on those grounds, the parties had only lived separate and apart for twenty-two and a half months. Moreover, the wife had condoned the adultery in issue. Thus, the two year separation ground was not quite ripe, and there was reason to believe that the adultery would not withstand a challenge. Under these circumstances, it is particularly noteworthy that the parties had not agreed in advance of trial to an amendment of the complaint on the ground of a one year voluntary separation. Further, their

---

1. We note that the parties have had several different lawyers. Counsel for appellee at trial was not the attorney who filed the complaint.

separation agreement did not suggest that both parties wanted to end the marriage. Nevertheless, with only a few weeks remaining to achieve the unassailable two year ground, trial commenced in the Circuit Court for Baltimore County.

At trial, over the husband's vigorous objection, the court permitted appellee to amend her complaint to include a claim for divorce based on a one year voluntary separation. Ultimately, the court granted appellee an absolute divorce on that ground. Subsequently, the court found appellant in contempt for failure to pay child support and sentenced him to the Baltimore County Detention Center, setting a purge amount of $11,900.00.

Appellant appeals from the court's judgment of divorce and from the contempt finding. He presents the following questions for our review:

I. Did the court err in granting the wife an absolute divorce on the grounds of a one-year mutual and voluntary separation?

II. Did the court err in admitting into evidence and allowing cross-examination of [the] husband on settlement discussions and a document prepared by [the] husband's lawyer for settlement purposes?

III. Did the court err in sentencing [the] husband to jail for civil contempt with a purge provision where the court refused to take, consider and even mark for identification evidence concerning [the] husband's ability to pay?

In her brief, appellee frames the following issue, which we have reworded slightly:

Regardless of the parties' mutual and voluntary separation, was appellee entitled to a divorce on the ground of adultery, because condonation is not an absolute bar?

We are of the view that the trial court erroneously granted a judgment of divorce on the ground of a one year voluntary separation; the proof was insufficient to establish the element of mutual intent to end the marriage. Further, the court erred in concluding that condonation is an absolute bar to a

divorce on the ground of adultery. Therefore, we shall vacate the judgment of divorce and remand for further proceedings. As the court did not preclude appellant from offering evidence in the contempt proceeding, we shall affirm the contempt order. In light of our holdings, we decline to address appellant's second issue.

### Factual Summary

The parties were married on November 29, 1981 and have two minor daughters. Mr. Aronson was the founder and part owner of Ecu–Med, Inc., doing business as Aronson Medical & Respiratory Services ("Aronson Medical"). Ms. Aronson is the owner of Cruises Plus, a travel business.

In December 1992, appellee discovered that appellant was involved in an adulterous relationship with Ms. Stella Natarova,[2] one of his employees. When appellee confronted appellant, he admitted to the adultery. The parties did not then separate; instead they engaged in discussions, lasting several months, about the future of their marriage. On or about April 1, 1993, appellee agreed to condone her husband's adultery on the condition that he not have any future contact with Ms. Natarova, and that he dismiss his paramour from employment; appellant agreed.

In June 1993, appellee discovered some checks, issued by Aronson Medical and made payable to Ms. Natarova, in appellant's briefcase. When she confronted appellant, he stated that the monies were part of a severance package. He admitted personally delivering the checks to Ms. Natarova, but claimed that no improprieties occurred during his contacts with her. Nevertheless, appellee no longer considered the parties as husband and wife. Although the parties continued to reside together in the family home, they ceased any sexual relations at that time.

In September 1993, appellee learned that appellant had purchased a condominium unit in Baltimore City. She waited

---

2. In the transcript, the name is also spelled "Natrova."

for two weeks before confronting appellant about the purchase; during that time, appellant never acknowledged having purchased the condominium. Consequently, appellee retained counsel but continued to reside in the marital home.

On January 31, 1994, the parties entered into a written separation agreement (the "Agreement"). It was then that Ms. Aronson left the marital home. The parties have not resided together since that time. The Agreement provided, in relevant part, as follows:

> **WHEREAS**, in consequence of current differences between Husband and Wife, Wife and Husband have agreed that Wife and the two Minor Children shall move from the family home.
>
> **WHEREAS**, *the Husband does not wish to end the marriage,* and having love for his Wife; and Husband and Wife both having love for the Minor Children; nevertheless, *they have agreed to a trial separation,* which does not constitute abandonment by either Husband or Wife.
>
> **WHEREAS**, *the purpose of this separation is to give both parties time to think of their investment in marriage and seek professional counseling.*
>
> **NOW, THEREFORE**, in consideration of the promises and mutual covenants and understandings of each of the parties, the parties hereto covenant and agree as follows:
>
> 1. *LENGTH OF TRIAL SEPARATION.*
>
> This Agreement shall govern the parties for a period of six (6) months. *During this time, should the parties agree to reconcile, this Agreement is void.* Reconciliation shall mean resumption of cohabitation. At the end of six (6) months, either Husband or Wife may ask the other for the right to reconcile. If either of the parties chooses not to reconcile, then all obligations under this Agreement herein cease.
>
> \* \* \* \* \*
>
> 12. *RELINQUISHMENT OF MARITAL RIGHTS.*

The parties shall continue to live separate and apart, free from interference, authority and control of the other, as if each were sole and unmarried; and each may conduct, carry on or engage in any business, profession or employment that to him or her may seem advisable, without any control, restraint or interference by the other party in all respects as if each were unmarried. Neither of the parties shall molest or annoy the other or seek to compel the other to cohabit or dwell with him or her by any means whatsoever, or exert or demand any right to reside in the home of the other.

\* \* \* \* \*

### 26. COUNSELING.

This Agreement is entered into with the earnest hope of both parties that they will seek counseling. Husband will be responsible for any costs incurred by Wife for counseling that Husband's insurance does not pay. Each party shall have the right to choose his or her own counsellor, and all such counseling shall be confidential. Additionally, it would be strongly suggested that an occasional joint monthly meeting of the parties and a counselor of Wife's choice shall be held *to discuss progress in reconciliation.*

(Emphasis added).[3]

On July 24, 1994, less than six months after the Agreement was executed, appellee filed a complaint for absolute divorce on the grounds of a two year separation and adultery. Appellant never filed a counterclaim. In his answer, he denied that the parties were beyond reconciliation. At trial, the parties and Jeffrey Pollack, the Certified Public Accountant for appellant and Aronson Medical, were the only witnesses. Mr. Pollack's testimony did not concern any of the grounds for the

---

**3.** The Agreement also specified the custody and visitation arrangements for the parties' daughters. Further, it addressed appellant's obligations to pay bills, alimony, and child support, and to provide health and life insurance for the benefit of appellee and the children. These provisions are not in issue.

divorce. Rather, it dealt only with Mr. Aronson's financial situation.

Appellee testified about her discovery of appellant's infidelity and her decision to condone it in April 1993. She believed that appellant had continued his relationship with Ms. Natarova, because he had "lied" about the checks. She said, "And I think because he lied and kept it away from me there was something more than just severance pay only, because he didn't say the truth." Although appellee had "heard" that appellant was still involved with Ms. Natarova after the separation, she acknowledged that she had no evidence that appellant had actually engaged in adultery after her condonation.

Appellee also testified about her discovery of the condominium purchase. Appellant told her he bought the unit because it was a "good deal." After the confrontation about the condominium, appellee said she "knew then that it's time ... to see a, to go see a lawyer and it was time to call it quits." She further said that after discussing the issue from September 1993 to January 1994, she and appellant agreed that she would move out of the house. As appellant agreed to the separation and did not object to it, she considered the separation as "mutual and voluntary."

Appellee called her husband as a witness. Appellant testified that appellee wanted a trial separation, to which he agreed. But he insisted that he never desired to end the marital relationship. Instead, he maintained that he agreed to separate, at appellee's request, to "ameliorate" the conflict, to give the parties a "cooling off period," and to let them seek counseling. The following colloquy ensued:

**Counsel for appellee:** Now, ultimately it was determined when you and Mrs. Aronson decided to separate, by the way, the decision to separate in January of '94, that was by agreement, correct, on a trial basis?

**Mr. Aronson:** I only agreed that we should try the separation if we were really going to have it as a trial and a way, I encouraged, I even wrote in the agreement for her to seek

therapy and I get some help and we make an effort to fix things. That was my understanding.

**Counsel for appellee:** Mr. Aronson, my only question was, you agreed to a trial separation at that time, correct?

**Mr. Aronson:** That's the answer.

**Counsel for appellee:** Thank you. When the six month trial separation was over you wanted to renew it for an additional six month trial period, correct?

**Mr. Aronson:** That is correct.

**Counsel for appellee:** Which would have been a separation by agreement for a 12 month period commencing in January of 1994, correct?

**Mr. Aronson:** I don't know if six months was the right number, but some additional time.

**Counsel for appellee:** Didn't you just say you wanted to renew it for six months?

**Mr. Aronson:** No, you said six months.

**Counsel for appellee:** And you said yes?

**Mr. Aronson:** I said yes. I meant I wanted to renew the agreement in some form.

**Counsel for appellee:** Mrs. Aronson wanted the separation to become permanent correct?

**Mr. Aronson:** No. That isn't true.

**Counsel for appellee:** But the separation has been permanent; is that right?

**Mr. Aronson:** So far it's been permanent.

**Counsel for appellee:** And you—

**Mr. Aronson:** Nothing, there is nothing that is irreconcilable about our marriage and/or our separation. Unfortunately this entire circus with courts and lawyers and everything, it just, it tears down any possibility to fix or repair anything. And for two years we have been imbedded in nothing but a circus of lawyers, frankly.

In view of appellant's acknowledgement that he had agreed to the trial separation in January 1994 and had wanted to renew it for an additional period of time, the court permitted

appellee to amend her complaint to include the ground of a one year voluntary separation.[4] The following exchange is relevant.

**The Court:** Do you want to renew your motion to amend your bill of complaint?

**Counsel for appellee:** I do, Your Honor.

**The Court:** Now, what's your position in regard to that, in view of what your client just said?

**Counsel for appellant:** My client's position all along in this case has been he does not want to get divorced, he was willing to try a separation. He has always been bent on— his opinion is that the separation, he has agreed to a separation only from the point of view, that of trying to work things out with his wife. That is different than separating with a mutual intent to end the marriage. It is not the same thing. His position is that he hasn't done that. And objects.

**The Court:** It was mutual, voluntary separation, that's what it was, wasn't it? I mean, that's what he just said, that on January they agreed to separate.

**Counsel for appellant:** They agreed to separate for six months.

**The Court:** Then they agreed for another six months.

**Counsel for appellant:** They did not—

**The Court:** For another period of time.

**Counsel for appellant:** No, he—

**The Court:** Okay. They agreed in January to separate.

**Counsel for appellant:** Yes.

**The Court:** They have, in fact, been separated for almost two years.

---

4. Earlier, at the completion of appellee's testimony, her counsel sought to amend the complaint to conform to the proof. Counsel said: "I don't believe that former counsel filed on mutual voluntary ground. I believe the evidence *prima facie* thus far supports [that] ground...." After appellant objected, the request was denied.

**Counsel for appellant:** Correct.

\* \* \*

**The Court:** Okay. Granted.

**Counsel for appellee:** Thank you, Your Honor.

**Counsel for appellant:** Just for the record today, I object to Your Honor's ruling.

**The Court:** You object to the allowing him to amend to include the one year voluntary separation?

**Counsel for appellant:** Correct.

**The Court:** Okay. The objection is on the record.

When called to testify for his side of the case, appellant asserted that, at the end of the six month separation period, he wanted to reconcile. He asked his wife to return to the marital home, and had written her letters requesting her to do so, but she refused. On cross-examination, the court permitted appellee to impeach appellant with an "Addendum Agreement", drafted and signed by appellant on August 4, 1994, which proposed an additional five month separation on the same terms as the Agreement. Appellee never executed the addendum. Appellee sought to show that appellant voluntarily agreed to the separation and to an extension of it.

In closing argument, appellee claimed that she was entitled to a divorce on the ground of a two year separation, a one year separation, and adultery. As to the two year ground, appellee argued that the court should consider the time from May 1993 to January 1994, when the parties resided together but did not cohabit, in order to satisfy the required two year period of separation. As to adultery, appellee argued that appellant breached the conditions pursuant to which the wife condoned appellant's conduct. With respect to the claim of a one year voluntary separation, appellee's counsel asserted that the parties agreed to a six month "trial" separation, which was later extended by agreement. Based on appellant's failure to testify truthfully concerning his request to renew the separation, counsel urged the court to discredit appellant's testimony and to find instead a mutual agreement to separate for the statuto-

ry period. To support appellee's position, counsel also argued that appellant failed to corroborate his claim that he lacked the intent to end the marriage. Counsel for appellee said, in part:

There was certainly adequate opportunity to bring in corroboration of that intent, but he brought none in. So all we have is his own testimony, which has been directly impeached....

There is no indication from Mr. Aronson except his appearance at this trial and his testimony at this trial that at any time did he object to the separation, did he object to the separation continuing, or that he objects to a divorce now, except for the fact that it's going to cost him some money. The reality is that these parties could be divorced in six weeks. And all that would be accomplished by deferring this matter for six weeks would be to give Mr. Aronson six weeks to play with his assets and hide his money to avoid whatever award Your Honor is going to give. The evidence does not permit Mr. Aronson out of that hole.

\* \* \*

[B]ut his affirmative testimony yesterday was that at the end of the separation period he asks for an additional six month separation. Six months plus six months would be 12 months. 12 months is what you need.

And, therefore, what the evidence out of Mr. Aronson's own mouth and documents demonstrates is that Mr. Aronson agreed to a separation and that after then agreed to a further separation, which although now he says he doesn't have, or want to have resulted in a divorce, which now by his own testimony was to extend for at least 12 months. Therefore, we have a mutual agreement to separate with the intent of not having a marital relationship for ... at least a period of 12 months. That's a ground for divorce.

Appellant countered, *inter alia,* that the two year ground was not satisfied, because the parties did not live apart for the requisite period. He claimed that the wife's condonation

defeated the adultery, because there was no proof of a subsequent offensive marital act or cruelty. Finally, as to the one year period, appellant strenuously argued that the wife failed to show the requisite mutual intent to end the marriage. Counsel said: "[H]e is entitled to stand steadfast under the laws of the State of Maryland and contest that that is a two year separation...."

Before ruling, the court expressed unequivocally that appellant's testimony was not credible. The court said:

> To say that Mr. Aronson is not a credible witness is the grossest understatement in the world. To say that his testimony was believable, or was unbelievable is a—is not doing it justice. I mean, I don't know how you would convince, I don't care if you go to the bankruptcy court or you go to the U.S. District Court, or you go to the Court of Appeals or the Court of Special Appeals, or the Supreme Court of the United States, in the Fourth Circuit, the Court of Appeals, I don't care where you go. I don't care if you go to traffic court, you testify the way you testified before me, I don't know who you are going to convince.

Thereafter, the court granted appellee an absolute divorce on the ground of a voluntary one year separation.[5] It said, in part:

> Adultery. It's been argued to me that I should grant a divorce based on adultery. Well, there is no question that Mr. Aronson committed adultery, there is—he admits it, that he committed adultery. There is also no question that Mrs. Aronson, knowing of adultery, continued to live with him and, in fact, in the law did what we know as condone the adultery.... I believe that once that happens, then that adultery is no longer a ground for divorce. There has

---

5. The court rejected the two year ground, relying on *Mount v. Mount,* 59 Md. App. 538, 476 A.2d 1175 (1984), which held that the parties must actually live separate and apart; failure to cohabitate while remaining in the marital home is not sufficient to satisfy the two year requirement. Neither party has challenged the trial court's decision in this regard.

to be a new adultery that occurs after the condonation and it's not been condoned by the wife.

Well, Mr. Aronson may very well—I wasn't born yesterday, I mean, you don't buy a condominium just because you are walking by and you see it's for sale and, you know, you are in debt to everybody in the world, but you decide to spend ... [$]106,000, because it looked like it was a good deal. That's absurd. You don't continue to pay your paramour monies if you no longer are involved. So could very well be that Mr. Aronson was continuing his relationship. .

\* \* \* \* \*

But he doesn't remember whether he had sexual relations with anybody in the past year. That was as believable as the rest of the testimony that I have heard from him, quite frankly. So he may have. Probably did. *But I don't have the proof. I don't have the evidence. So, I can't find by a preponderance of the evidence that he did commit adultery in the past year, so since it was condoned, so I can't grant a divorce based on the adultery.*

One year separation.... I find as a matter of fact that there was an express agreement to separate. I find as a fact that both Mr. Aronson and Mrs. Aronson agreed that they would live separate and apart, they agreed that Mrs. Aronson would leave the marital home. They agreed that when she left the marital home it was, at least for that period of time, not to resume the marriage relationship. Their purpose was to separate, to separate themselves from being married.... It was their intent to not resume the marriage, for that period of time.

Now, in fact, I find as a fact that after that six month period ended that six month period was extended. I find that from the testimony of Mrs. Aronson, which I believe, there was an extension of the six month separation agreement. I find that Mr. Aronson proposed it. I find his testimony to the contrary. *His testimony about how he didn't want to separate, how he didn't want the divorce, how*

*he didn't want there ever to be a divorce between the parties absolutely unbelievable. It is not credible. You would have to see him and hear him and watch him and look at him as he testified to it, to know that it is not credible. It's not.*

\* \* \* \* \*

I find as a fact that they voluntarily separated. I find as a fact they remained separate and apart for more than 12 months after the voluntary separation. I find as a fact there is no reasonable hope or expectation of a reconciliation between these parties. These people cannot be back together, I find as a fact. Therefore, the one year separation of the parties has continued uninterruptedly for one year. It was voluntary. Neither one of them forced the other to separate. They did it with the express intent and purpose of during the period of the separation ending the marital relationship, not continuing it. . . . I will grant them a divorce a vinculo matrimonii.[6]

(Emphasis added).

Appellant timely noted his appeal from the judgment.

Subsequently, appellee filed a contempt petition, in March 1996, alleging appellant's failure to pay child support. Prior to the hearing on June 3, 1996, appellant filed for bankruptcy, but had sent $8,100 to appellee, designating it for his child support payment. Appellee decided instead to apply the money toward the marital payment of $50,000 that appellant owed at that time.

The trial court concluded that appellee was entitled to apply the money toward the marital payment, and found appellant in contempt for not paying child support of $20,000 between January and May 1996. The court ordered appellant incarcerated for contempt, but included a purge provision permitting

---

6. The court also entered a consent order concerning the custody of the children, visitation rights, and marital property distribution, from which neither party appeals.

appellant to avoid the incarceration by paying $11,900 to appellee.

The court anticipated appellant's argument that he was unable to pay, saying:

Now his argument is "I can't pay it."

Well, his argument was he couldn't pay it when we had the trial. That was what the whole trial was about, how he doesn't have the money, how it's not there. And I made a finding that he does.

I mean that's where we were. We were in no more difficult position now than then. He says, "I don't have it." I didn't believe him.

Appellant expressed his view that it would be inappropriate for the court to rule on the petition while "convinced that it's going to make a finding that it already doesn't trust Mr. Aronson's credibility." Appellant later told the court that he had exhibits for identification for the hearing, but then digressed into arguments with the court concerning a potential conflict between the court's ruling and the bankruptcy proceeding, and whether the court would grant a stay of the contempt order. Appellant never offered the exhibits as evidence, never advised the court that he had witnesses for the hearing, and never objected to the court's comments, on the ground that the court did not consider his inability to pay.

On June 5, 1996, after appellant noted his appeal from the contempt order and filed an emergency motion for a stay of the order, we granted the stay of the contempt order. When we lifted the stay of the contempt order on June 19, 1996, appellant paid the purge amount.

We shall include additional facts in our discussion of the issues.

### Discussion

### I.

■ It is undisputed that, at the time of the hearing, the parties had been physically separated for more than 12

months and there was no reasonable expectation of reconciliation. Nevertheless, appellant argues that the trial court improperly granted the divorce on the ground of a one year voluntary separation. Appellee disagrees but argues, alternatively, that she was entitled to a divorce on the ground of adultery.

During the trial, as we observed, appellee amended her complaint to add the ground of a one year voluntary separation.[7] Although appellant concedes that he agreed to the physical separation, he asserts that he did not separate with the requisite intent to terminate the marital relationship. Thus, he claims that the separation was not "voluntary" within the meaning of Maryland Code, Family Law Article ("F.L.") § 7–103(a)(3) (1957, 1991 Repl.Vol.), because it was not accompanied by a mutual agreement to end the marriage. Appellee disagrees. This dispute requires us to examine the concept of the term "voluntary separation" as it is used in F.L. § 7–103(a)(3).

F.L. § 7–103(a) sets forth the grounds for obtaining a divorce. It states, in pertinent part:

(a) *Grounds for absolute divorce.*—The court may decree an absolute divorce on the following grounds:

(1) adultery;

\* \* \* \* \*

(3) voluntary separation, if:

(i) the parties voluntarily have lived separate and apart without cohabitation for 12 months without interruption before the filing of the application for divorce; and

(ii) there is no reasonable expectation of reconciliation;

\* \* \* \* \*

---

**7.** We note that the parties had not been separated for at least twelve months in July 1994, when appellee filed her complaint for divorce. *See* F.L. § 7–103(a)(3)(i).

(5) 2–year separation, when the parties have lived separate and apart without cohabitation for 2 years without interruption before the filing of the application for divorce;

██ In *Wallace v. Wallace*, 290 Md. 265, 429 A.2d 232 (1981), the Court of Appeals interpreted the voluntary separation provision in Maryland Code (1957, 1981 Repl.Vol.), Art. 16, § 24, the predecessor to F.L. § 7–103(a)(3).[8] What the Court said is pertinent here:

In order to establish the existence of the twelve month voluntary separation ground for divorce *a vinculo* . . . three elements must be shown: (i) an express or implied agreement to separate, *accompanied by a mutual intent not to resume the marriage relationship;* (ii) voluntarily living separate and apart without cohabitation for twelve months prior to the filing of the bill of complaint; and (iii) that the separation is beyond any reasonable hope of reconciliation.

*Id.* at 275, 429 A.2d 232 (emphasis added); *see also Smith v. Smith,* 257 Md. 263, 266, 262 A.2d 762 (1970). Indeed, the Court of Appeals has consistently held that voluntariness requires an agreement to live separate and apart, coupled with a common intent to terminate the marriage. *See Sullivan v. Sullivan,* 234 Md. 67, 72, 197 A.2d 910 (1964); *Foote v. Foote,* 190 Md. 171, 179, 57 A.2d 804 (1948); *France v. Safe Deposit & Trust Co.,* 176 Md. 306, 4 A.2d 717 (1939); *Campbell v. Campbell,* 174 Md.229, 198 A. 414 (1938). Thus, in *Sullivan,* 234 Md. at 72, 197 A.2d 910, the Court said that "a voluntary separation as a ground for divorce connotes and requires a mutual agreement between the husband and wife to live

---

8. Maryland's divorce statute has included a ground for voluntary separation since 1937. *See* 1936 Md. laws ch. 396 (creating a ground for divorce based on the parties having "voluntarily lived separate and apart" for 5 years). In 1984, the General Assembly recodified the divorce statute in the Family Law Article. *See* 1984 Md. Laws Ch. 296 (reenacting the divorce statute, including a ground for "voluntary separation"). When the Legislature reenacts a statute, including language which the Court of Appeals has previously interpreted, we presume that the Legislature has approved and adopted the Court's interpretation. *Williams v. State,* 292 Md. 201 (1981); *Bingman v. State,* 285 Md. 59, 400 A.2d 765 (1979).

separate and apart *with a common intent not to resume marital relations."* (Emphasis added). Similarly, in *Foote,* 190 Md. at 179, 57 A.2d 804, the Court pronounced: "[I]n order for the separation of husband and wife to be regarded as voluntary *within the meaning of the statute* there must be an agreement of the parties to live separate and apart *with a common intent not to resume marital relations."* (Emphasis added). *See also* John F. Fader, II & Richard J. Gilbert, MARYLAND FAMILY LAW, § 3–5(d), at 83 (2d ed. 1995) ("As stated in *Smith v. Smith* [257 Md. 263, 262 A.2d 762 (1970) ], the intention at the time of separation must be an intent not to resume marital relations." (Emphasis added; footnote omitted.)).

▪▪▪ In contrast, "[a]cquiescence in or assent to what one cannot prevent does not amount to a voluntary agreement to separate." Fader & Gilbert, *supra,* § 3–5(d), at 83; *see Stumpf v. Stumpf,* 228 Md. 350, 179 A.2d 893 (1962); *Moran v. Moran,* 219 Md. 399, 149 A.2d 399 (1959); *Carney v. Carney,* 16 Md.App. 243, 295 A.2d 792 (1972); *see also Lloyd v. Lloyd,* 204 Md. 352, 359, 104 A.2d 595 (1954) ("Even the realization by both husband and wife that their separation is final ... does not of itself establish an agreement that they shall live apart."). Nevertheless, the elements of mutuality and separation need not coincide at the inception of the separation. Indeed, an involuntary separation may later be transformed into a voluntary separation. *Wallace,* 290 Md. at 277, 429 A.2d 232; *Mount v. Mount,* 59 Md.App. 538, 476 A.2d 1175 (1984); *see also* Fader & Gilbert, *supra,* § 3–5(d), at 83. Thus, a separation that begins as a desertion may later achieve "voluntary" status.

▪▪▪ In sum, the cases teach that a voluntary separation must be accompanied by a mutual intent to terminate the marriage; mutuality of intent is a component of voluntariness. Voluntary, " 'when used in reference to a common act of two or more persons affecting their common relationship ... means that they acted in willing concert in the doing of the act.' " *Nichols v. Nichols,* 181 Md. 392, 394, 30 A.2d 446

(1943) (quoting *Kline v. Kline,* 179 Md. 10, 15, 16 A.2d 924 (1940)).

> In order to be awarded a decree of divorce for voluntary separation, the plaintiff must establish that the parties entered into a mutual and voluntary agreement to separate *and* not to resume the marital relationship. The separation for the purposes of the statute commences on the date that this agreement occurs even if the parties have separated prior to reaching this agreement.

Bernard A. Raum, MARYLAND DOMESTIC RELATIONS LAW § 4:16 (1996) (emphasis added; footnotes omitted).

■ The essential difference, apart from time, between the one year separation and the two year separation embodied in F.L. § 7–103(a)(5) is that the one year separation must be "founded upon a ground which is consensual and not culpatory, manifesting an intention to permit the marriage relationship to be terminated in law, as well as in fact, without regard to fault." *Rhoad v. Rhoad,* 21 Md.App. 147, 151, 318 A.2d 551 (1974). In contrast, "[w]ith respect to the statutory separation ground [in F.L. § 7–103(a)(5) ], the voluntariness of the separation plays no part." *Id.* Therefore, when one party to the divorce is not willing voluntarily to terminate the marriage relationship, the two year separation ground precludes "a party from perpetually preventing his or her spouse from obtaining a decree of divorce *a vinculo matrimonii.*" *Flanagan v. Flanagan,* 14 Md.App. 648, 654, 288 A.2d 225 (1972).

■ Certainly, there are occasions when married parties "agree" to separate "voluntarily," because they are undecided about the future of their marriage or for reasons wholly unrelated to the purpose of termination of the marriage. For example, the parties may need to live apart for an extended period of time when one spouse is in the military or accepts a work assignment overseas. That the parties have, in fact, been physically separated for twelve months, based on an agreement to live apart, does not alone satisfy the requirements of the voluntary separation; to establish the one year ground, there must be "more than a mere physical separa-

tion." Fader & Gilbert, *supra*, § 3–5(d) at 84. The separation must be accompanied by a mutual intent to terminate the marriage.

*France v. Safe Deposit & Trust Co. of Baltimore*, 176 Md. 306, 4 A.2d 717 (1939), is instructive. There, the wife claimed that the husband suggested that she visit her sister in Italy, as the sister was ill. Thereafter, he refused to send her money to return to the United States. Testimony in the case also showed that the wife was in poor physical and mental health, and was incapable of traveling alone. At the end of the statutory period, the husband filed for divorce on the ground of a five year voluntary separation. What the Court said is pertinent here:

> The question in this appeal is whether the facts stated show that separation of the parties was voluntary [for the requisite statuory period of five consecutive years].
>
> * * *
>
> As used in the [Code, art. 16, § 38] and construed in [*Campbell v. Campbell*, 174 Md. 229, 198 A. 414 (1938) ], a voluntary separation is a physical separation of the parties, by common consent with a common intent not to resume marital relations. It does not mean a mere physical separation where one of the spouses for business or pleasure leaves the other, intending to return, and with no intention of affecting their marital relationship. Any other construction would mean that whenever a wife took her children to a summer resort, or a husband went on a business trip, there would be a "voluntary" separation within the meaning of the Act, which is manifestly absurd.

*France*, 176 Md. at 325, 4 A.2d 717. *See also Benson v. Benson*, 204 Md. 601, 605, 105 A.2d 733 (1954) (stating that voluntary separation "connotes more than a mere physical separation . . . .").

In our consideration of the question presented, we begin with a review of appellee's testimony. We have scoured the record in an effort to find direct testimony from appellee to support her claim that appellant separated with the intent to

terminate the marriage. Appellee provided the following testimony:

**Counsel for appellee:** For the record, when was the date of the separation?

**Appellee:** January 31, 1994.

**Counsel for appellee:** And who moved out of the marital home?

**Appellee:** I did.

**Counsel for appellee:** *Okay. And you and Mr. Aronson have remained separate and apart without cohabitation and without resuming residence together and without sexual relations since that time; is that correct?*

**Appellee:** Absolutely, that's correct.

**Counsel for appellee:** All right. Now when you moved out were, or at any time thereafter did Mr. Aronson demand that you come home or demand a reconciliation of the marriage?

**Appellee:** No, he never did, no.

**Counsel for appellee:** Although [appellant] hasn't filed any pleadings seeking a divorce himself, has he at any time indicated to you that except for your adultery ground he objects to the marriage being ended?

**Appellee:** *We really never talked about it, but he never objected.* That was my understanding when I moved out that when the time comes, year—

\* \* \* \* \*

**Counsel for appellee:** Okay. Now, as a result of speaking to counsel and these events [finding the checks and the purchase of the condominium] did you discuss the future of the marriage again with Mr. Aronson?

**Appellee:** Yes, I did.

**Counsel for appellee:** Did he at that time object to a separation or did he object to who was going to move out of the house?

**Appellee:** No.

**Counsel for appellee:** Didn't he object to anything?

**Appellee:** *Well, I don't think he objected to a separation.* It was really hard to live in the same house. *We really didn't talk too much to each other* and it was probably to all the best of our interests that somebody will move out or we will solve it somehow.

\* \* \* \* \*

**Counsel for appellant:** All right. So you never separated then at all? You never, so this is the only separation you have had; is that right?

**Appellee:** That's correct.

**Counsel for appellant:** Was there any discussion about who would move out?

**Appellee:** We were going back and forth. And we agreed there that it would be better that I move, with the children. It was agreed upon, both of us agreed to that.

\* \* \* \* \*

**The court:** Then you, in fact, separated in January of '94?

**Appellee:** That's correct.

**The court:** Since January of 1994 you have not lived with him, cohabited with him?

**Appellee:** Nothing.

**The court:** Or had any sexual relations with him?

**Appellee:** Nothing actually since June of, May of '93, but I lived in the same house.

\* \* \* \* \*

**Counsel for appellant:** Now you stated in your testimony, Mrs. Aronson, that [appellant] did not object to the separation. And you also stated in your testimony that he has never asked you to move back in. But has he ever agreed to the separation? *Have you ever heard him telling you that he agreed to the separation between the two of you as mutual and voluntary?*

**Appellee:** *It was mutual and voluntary to my understanding.*

**Counsel for appellant:** Well, isn't it a fact, Mrs. Aronson, that you moved out and wanted to end the relationship?

**Appellee:** I, we went over from September of '93 until January, took us four months to come to an agreement. And it was a mutual agreement to the best, for both of us and the children and I that I will move out. Yes, this was both of our agreement.

\* \* \* \* \*

**Appellee:** It was an agreement on everything. It was a, *he wanted a six months separation agreement—*

(Emphasis added.)

We pause to compare the foregoing testimony to the evidence presented in *Wallace,* 290 Md. 265, 429 A.2d 232. There, the Court considered the divorce statute in the context of a suit for alimony. As the husband in that case had already obtained a divorce in Virginia, the Court analyzed whether Ms. Wallace could assert a claim for alimony, since she would have been entitled to a divorce under Maryland law. Although the husband had abandoned his wife for another woman, and the separation was not initially mutual, the wife testified that, at a certain point, "the separation [became] agreeable" to her, which the husband understood. Moreover, in the husband's pleadings, he admitted that the separation ultimately became "mutual and voluntary." *Id.* at 276, 429 A.2d 232.[9]

---

**9.** The Court noted, however, that the wife could not establish the elements necessary for a voluntary one year separation, because the parties' mutual intent to end the marriage had not existed for the required 12 months. The Court stated:

[T]he proof does not support ... a mutual separation for twelve months prior to the filing of the complaint existed, for the evidence indicates that this durational requirement was not met. It appears that the acquiescence of the respondent was transformed into a mutual agreement of the parties, as the court found, sometime late in June, 1977, and as the amended bill was filed on June 6, 1978 ... the requisite twelve month separation prior to the filing of the bill cannot be said to have transpired.

*Id.* at 277, 429 A.2d 232.

In marked contrast to *Wallace,* appellee never affirmatively represented that both parties wanted to end the marriage. Instead, in response to a question from her attorney about whether appellant objected to ending the marriage, she merely said: "We really never talked about it, but he never objected." Apart from testimony that appellant agreed to the separation, she failed to describe statements or conduct by appellant that evinced his intent to end the marriage. Moreover, appellee's assertion that the parties agreed that she would move out of the marital home does not distinguish between an agreement to separate, which appellant concedes, and an agreement to separate for the particular purpose of terminating the relationship, which appellant contests. Further, unlike in *Wallace,* appellant's answer reflects that he did not want to end the marriage. In his answer, appellant stated, in part:

2. [Appellant] denies the allegations as to any expectation or hope of reconciliation, in that he earnestly entered into an agreement with his wife to give her breathing room to allow her to mend the marriage and he sincerely believes that this is possible. He admits the allegations that the parties have been separated since January 31, 1994.

Interestingly, appellee argued at trial that appellant failed in his burden and did not corroborate his testimony regarding intent. As the moving party, however, it was appellee who had the burden of proving that the separation was *mutually* voluntary, within the meaning of the statute. Fader & Gilbert, *supra,* § 3–11(c) at 97; *Nichols,* 181 Md. at 394, 30 A.2d 446. Moreover, every element of the claim must be corroborated. F.L. § 7–101(b) ("A court may not enter a decree of divorce on the uncorroborated testimony of the party who is seeking the divorce."); *see Smith,* 257 Md. at 266, 262 A.2d 762 ("That *every* element *must* be corroborated is well settled."); *Styka v. Styka,* 257 Md. 464, 263 A.2d 555 (1970); *Fuller v. Fuller,* 249 Md. 28, 237 A.2d 925 (1968); Fader & Gilbert, *supra,* § 3–5(c) at 83. The corroboration, however, need only be slight. *Zulauf v. Zulauf,* 218 Md. 99, 107, 145 A.2d 414 (1958). It may take the form of admissions

by a spouse, when "the testimony is trustworthy...." Fader & Gilbert, *supra*, § 3–11(d) at 97.

In our assessment of the evidence, we also note that appellee never called any witness, other than appellant, to corroborate her case. Appellee relies on F.L. § 8–104 and argues that the Agreement corroborated her testimony that the parties voluntarily separated within the meaning of F.L. § 7–103(a)(3). Section 8–104 of the Family Law article permits a party to use a separation agreement for corroboration. It states:

> In a suit for absolute divorce on the grounds of voluntary separation, a separation agreement is full corroboration of the plaintiff's testimony that the separation was voluntary if the agreement:
>
> (1) states that the spouses *voluntarily agreed* to separate; and
>
> (2) is executed under oath before the application for divorce is filed.

(Emphasis added.)

"A writing is, of course, excellent evidence of the intent of the parties and when it recites that the parties voluntarily agreed to separate; it will not easily be cast aside." Fader & Gilbert, *supra*, § 3–5(d), at 83–84. This Agreement, however, does not buttress appellee's position. To the contrary, the Agreement clearly conflicts with appellee's assertion that the parties made a mutual and voluntary decision to separate *for the purpose of ending the marriage.* The Agreement, which was only operative for a six month period, expressly states that appellant "does not wish to end the marriage," and that the purpose of the separation was to permit the parties to consider their interests in the marriage and to seek counseling. Moreover, the paragraph concerning counseling suggests that the parties should meet regularly to discuss any progress toward reconciling their differences. Thus, the terms of the Agreement indicating that appellant did not wish to end the marriage, and encouraging the parties to obtain counseling, are at odds with appellee's claim that, at the time of separa-

tion, the parties had a mutual intent not to resume the marriage. We recognize that the Agreement also contains a provision in which the parties agreed to relinquish their marital rights during the period of the trial separation. That clause, however, does not allow us to disregard other provisions expressly included in the Agreement.

Appellee points to the language in the Agreement which states that, if "either of the parties chooses not to reconcile, then all obligations under this Agreement herein cease." Further, she argues that appellant demonstrated his intent to terminate the marriage by proposing an Addendum to extend the Agreement. She further contends that appellant failed to seek a reconciliation at the end of the six month separation and that this testimony was corroborated when the court expressly determined that appellant was not credible.[10] Relying on *Cullotta v. Cullotta,* 193 Md. 374, 66 A.2d 919 (1949), appellee argues that the trial court was entitled to find "negative corroboration" of appellant's intent to end the marriage; since the court did not believe appellant's protestations that he did not want to terminate the marital relationship, she urges that the converse must be taken as true. In *Cullotta,* the Court said:

"[T]o sustain the burden of proof, testimony of one spouse, flatly contradicted by the other, needs corroboration, but the inherent strength or weakness of opposing testimony may furnish corroboration."

*Id.* at 382, 66 A.2d 919 (quoting *Maranto v. Maranto,* 192 Md. 214, 217, 64 A.2d 144 (1949)).

The case of *Barr v. Barr,* 58 Md.App. 569, 473 A.2d 1300 (1984), provides some guidance to us, and leads us to reject

---

**10.** F.L. § 7–104(a) precludes a party from "destroying the status of an existing voluntary separation" by an offer of or attempt at reconciliation. *Carney v. Carney,* 16 Md.App. 243, 250, 295 A.2d 792 (1972) (interpreting predecessor statute). Here, as in *Carney,* it appears that the husband sought to introduce evidence of his attempt to reconcile to show "that prior to and at the time of the separation ... the husband did not want the separation nor agree to it," *id.* at 250, 295 A.2d 792, and not for the purpose of defeating an existing voluntary separation.

appellee's proposition under the circumstances of this case. In *Barr*, the wife filed for divorce based on the grounds of adultery and constructive desertion, claiming that the husband had refused to engage in sexual intercourse with her for at least four years. Although the husband admitted that he refused to have sexual relations with his wife, he claimed this did not constitute desertion, because he had not intended to terminate the marriage. We acknowledged that the trial court "is not bound to believe a litigant's expression of past intent." *Id.* at 577, 473 A.2d 1300. Rather, the court was entitled to infer from the husband's conduct—the admitted refusal to have sex with his wife, his adultery, and his departure from the marital home—that he intended to terminate the marriage. *Id.* We said: "Not only does the refusal belie the protestation [of lack of intent], but also his subsequent affair hardly imputes [a] suggestion of permanence to the nuptial bond." *Id.*

But *Barr* is readily distinguishable from this case in several critical respects. First, there was no evidence presented below of appellant's infidelity after the condonation, and it was appellee who actually moved out. Second, in *Barr*, the wife was far more direct in her testimony and supported her affirmative testimony with the husband's admission that he had refused to engage in marital relations. In contrast, appellee does not point to any statement by appellant in which he actually said he wanted to end the marriage. Indeed, the Agreement conflicts with that assertion. Further, in *Barr*, the couple's two children corroborated their father's admissions. Finally, the husband in *Barr* counterclaimed for divorce, thereby indicating that he wanted to terminate the marriage. Appellant, however, never filed a counterclaim. Rather, in his answer, appellant denied that there was no hope of reconciliation. Unlike *Barr*, in which the husband's actions clearly evinced an intent to end the marriage, notwithstanding his denials, appellee has failed to adduce sufficient evidence to establish that appellant had the intent to end the marriage. This is not a case in which one spouse, at the eleventh hour,

attempts to derail what has ripened into a one year voluntary separation.

To be sure, we do not quarrel with the finding by the trial court that appellant's testimony was unworthy of belief. As we see it, however, even in the light most favorable to appellee, that finding merely leaves the record with insufficient evidence as to appellant's state of mind concerning a critical element of appellee's case. Appellee did not expressly state that appellant agreed to the separation with the intention of ending the marriage; she called no witnesses, other than her husband; and the Agreement underscored appellant's desire not to end the marriage. By its terms, the Agreement was in effect for six months, until the end of July 1994. On July 24, 1994, several days *before* the expiration of the Agreement, appellee filed for divorce. Thus, at the expiration of the Agreement, and by the time appellant presented the Addendum, we have no doubt that appellee was not interested in a reconciliation. Nevertheless, this does not establish that appellant formulated the intent to terminate the marriage.

Given appellee's scanty presentation concerning a key aspect of her case, the court's disbelief of appellant simply was not enough to transform appellee's case. In spite of appellee's effort to characterize the evidence as sufficient to prove her claim, we must conclude that it was inadequate to dissolve the marriage on the ground of a one year voluntary separation. To hold otherwise would render the term "voluntary" completely superfluous. This we decline to do.

## II.

The Court found no evidence that appellant committed adultery subsequent to appellee's condonation of her husband's earlier infidelity. The court concluded that appellee's condonation of her husband's adultery constituted an absolute bar to a divorce on that ground. In response to appellee's query, the court indicated that, but for the bar of condonation,

it would have granted the divorce on the ground of adultery. The following colloquy is relevant:

**Counsel for appellee:** *I need clarification on two points. Your Honor gave your opinion as to the law of condonation and I respectfully disagree, as I told the court I would. In order that should this matter result in an appeal, as may will be—*

**The court:** Right.

**Counsel for appellee:**—could I impose upon the court to indicate to the Appellate Court that were my interpretation of the condonation Statute accurate and that it does not bar an absolute divorce that Your Honor would have been inclined to grant an absolute divorce in this case on that ground.

**The court:** If there was no condonation here legally that barred a divorce.

**Counsel for appellee:** Yes.

**The court:** Would absolutely grant a divorce based on adultery.

Appellee challenges the court's legal conclusion that condonation is an absolute bar to a divorce on the ground of adultery, absent a subsequent instance of adultery. Appellee contends that, but for the court's misunderstanding of the law, the court would have granted a divorce on the ground of adultery. She claims she is entitled to a divorce on that ground, because appellant breached the express conditions of her condonation, *i.e.*, no further contact with Ms. Natarova and her dismissal from employment. Therefore, she asks us to affirm the divorce decree on the ground of adultery.

■ As a preliminary matter, we reject appellant's contention that appellee has "improperly" raised the issue that she is entitled to an affirmance on the ground of adultery. As the party who prevailed in the trial court, appellee is entitled to assert any ground on appeal that would support an affirmance of the judgment in her favor, even those rejected by the trial court, without lodging a cross-appeal. What the Court stated

in *Paolino v. McCormick & Co.*, 314 Md. 575, 579, 552 A.2d 868 (1989), is pertinent here:

> Our cases apply a number of rules on the subject of when an appeal is impermissible, on the one hand, and when on the other, an appeal is required in order to raise certain issues. For example, an appeal or cross appeal is impermissible from a judgment wholly in a party's favor. *Offutt v. Montgomery Cty. Bd. of Ed.*, 285 Md. 557, 564 n. 4, 404 A.2d, 281, 285 n. 4 (1979). In that situation, however, despite a party's inability to raise adverse issues by appeal or cross appeal, if the losing party appeals, the winning party may argue as a ground for affirmance matters resolved against it at trial. As Judge Eldridge explained, for the Court, in *Offutt:*
>
>> [w]here a party has an issue resolved adversely in the trial court, but ... receives a wholly favorable judgment on another ground, that party may, as an appellee, argue as a ground for affirmance the matter that was resolved against it at trial.... This is merely an aspect of the principle that an appellate court may affirm a trial court's decision on any ground adequately shown by the record. *Id.* [citations omitted].

*See also Joseph H. Munson, Co. v. Sec. of State,* 294 Md. 160, 448 A.2d 935 (1982) (finding that the State, which had not cross-appealed, could not argue that the trial court failed to dismiss the suit for lack of standing, because the trial court's ruling came at summary judgment, not on a motion to dismiss), *aff'd,* 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984).

 "Condonation is, of course, forgiveness with an implied condition that the marital offenses shall not be repeated and that the party offended shall be treated with conjugal kindness and on breach of this condition, the right to remedy for former injuries revives." *Cullotta,* 193 Md. at 383, 66 A.2d 919; *see Stewart v. Stewart,* 256 Md. 272, 260 A.2d 71 (1969); *Dorsey v. Dorsey,* 245 Md. 703, 227 A.2d 617 (1967); *Smith,* 225 Md. at 286, 170 A.2d 195; *Lissy v. Lissy,* 180 Md.

689, 23 A.2d 39 (1941); *Timanus v. Timanus,* 177 Md. 686, 10 A.2d 322 (1940); *Moore v. Moore,* 36 Md.App. 696, 375 A.2d 37 (1977). Resuming normal marital relations is evidence of condonation. *Dorsey,* 245 Md. at 704, 227 A.2d 617; *Moore,* 36 Md.App. at 699, 375 A.2d 37. A violation of the implied conditions of condonation, may revive a previously condoned ground for divorce.

Condonation is not an absolute bar to a divorce on the ground of adultery. F.L. § 7–103(d) provides: "Condonation is not an absolute bar to a decree of an absolute divorce on the ground of adultery, but is a factor to be considered by the court in determining whether the divorce should be decreed." To overcome condonation, the condoning party has the burden of showing "subsequent conduct sufficiently serious to effect a revival of the offense condoned." *Smith,* 225 Md. at 286, 170 A.2d 195. *See, e.g., Dorsey,* 245 Md. at 704, 227 A.2d 617 (husband revived offense of adultery by continuing adultery); *Cullotta,* 193 Md. at 383, 66 A.2d 919 (husband who had previously assaulted his wife revived the offense by buying presents for another woman, slapping the wife in the face in front of their neighbors, and locking her out of their home); *Lissy,* 180 Md. 689, 23 A.2d 39 (husband's conduct in visiting female friend after his reconciliation with wife did not constitute cause for divorce); *Hilbert v. Hilbert,* 168 Md. 364, 373, 177 A. 914 (1935) (husband who had previously physically abused his wife revived the offenses by a lack of conjugal kindness as evidenced by his "abuse, threats, his throwing things at her, intoxication, and tirades of abuse...."); *Fisher v. Fisher,* 93 Md. 298, 48 A. 833 (1901) (husband who had committed adultery revived the offense by committing cruelty).

Appellant admitted in his answer that he had committed adultery; appellee's subsequent condonation was undisputed. Although the court properly found that appellee condoned the adultery, we agree that the court erred in concluding that the condonation necessarily barred a divorce on that ground. Nevertheless, we cannot grant a divorce on that basis. It is

for the trial judge to determine, as a factual matter, whether a divorce on the ground of adultery is warranted, within the meaning of F.L. § 7–103(d). Thus, we shall remand to the circuit court for a reconsideration of the adultery ground, in accordance with F.L. § 7–103(d).[11] On remand, if appellee chooses to pursue the adultery claim, the court should determine whether, following the condonation, appellant breached the implied conditions of condonation.

In light of our remand, we shall briefly comment on appellee's argument that appellant breached the express conditions that appellee allegedly attached to the condonation. We have found no authority to support appellee's assertion that the condoning spouse may attach *express conditions* to the condonation which, if breached by the offending spouse, may revive the original ground.

Appellee relies upon *Merriken v. Merriken,* 87 Md.App. 522, 590 A.2d 566 (1991), to support her argument that specific conditions may be attached to a spouse's condonation. In our view, *Merriken* is distinguishable.

In *Merriken,* the trial court granted the wife an absolute divorce on the ground of constructive desertion. Evidence in the case indicated that the husband had been physically abusive to the wife for nearly ten years before the separation, and that on the day the couple separated, he had pushed her out of the house in the middle of a snowstorm. We did not consider that a brief vacation, during which the couple cohabited, constituted condonation of the husband's prior offensive behavior. Even if the wife did condone the conduct, however, we said that the wife's "original grievances [were] immediately revived" by the husband's offensive conduct. *Id.* at 531, 590 A.2d 566. We noted that the wife "had conditioned reconciliation on [the husband's] doing something about his drinking; she was afraid of him when he was drunk because he became violent." *Id.* at 531, 590 A.2d 566. We went on to point out

11. On remand, the court will undoubtedly wish to reconsider the third ground for divorce advanced by appellee: a two year separation.

that the husband continued to drink, which caused his violent behavior, even though that was "another of [the wife's] reasons for leaving." *Id.* We further noted that, subsequent to the condonation, the husband had grabbed his wife's breast on a public street, while calling her an epithet, that he had begun an intimate relationship with another woman, and that he had failed to complete a psychotherapy program. Thus, there were numerous actions by the husband that amounted to a breach of the condition of showing conjugal kindness, independent of any express conditions of condonation made by the wife. Further, the wife's condition that her husband not behave violently toward her can be seen as an element inherent in the concept of conjugal kindness.

### III. Contempt Petition

Appellant claims that the trial court improperly refused to accept evidence concerning his ability to pay the purge provision. While appellant concedes that he has paid the purge provision, he argues that, because a second petition is pending, we should instruct the trial court as to the proper procedure to follow in determining a purge provision. Appellee counters that appellant never offered any evidence for the court's review, even though the court gave him the opportunity to do so. She also argues that the issue concerning the contempt is moot, because appellant has paid the purge provision.

Assuming, *arguendo,* that the claim is not moot, it is nonetheless without merit. Appellant correctly states that the trial court must afford a contemner the opportunity to show that he is unable to satisfy the purge provision. *See Rutherford v. Rutherford,* 296 Md. 347, 464 A.2d 228 (1983); *Johnson v. Johnson,* 241 Md. 416, 216 A.2d 914 (1966). Appellant had the burden of showing that he could not do so. *McDaniel v. McDaniel,* 256 Md. 684, 262 A.2d 52 (1970). The hearing transcript clearly shows, however, that appellant never offered for admission the evidence he now claims the court improperly declined to hear. The trial court simply had no opportunity either to admit or preclude the evidence.

As we see it, the court's comments expressing disbelief that appellant could not pay the purge, based on the trial proceedings that had occurred five months earlier, did not preclude appellant from offering evidence as to his then present ability to pay. To the contrary, after appellant expressed concern about having a lengthy hearing, the court stated to appellant's counsel:

> We can have as lengthy a hearing as you want to have.... It's okay with me. You know, ... its no threat to me that we can have a very lengthy hearing. It doesn't matter to me.

Although the court never expressly asked appellant if he had any additional evidence to produce concerning his ability to pay, neither did the court inform appellant that he did not have the opportunity to present evidence, or refuse to receive evidence offered by appellant. Thus, we find appellant's claim of error unfounded.[12]

**JUDGMENT VACATED AS TO DIVORCE ON THE GROUND OF ONE YEAR VOLUNTARY SEPARATION. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**FINDING OF CONTEMPT AFFIRMED.**

**COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**

12. Any future contempt proceedings must be governed by the contempt rules now found in Maryland Rule 15–201 *et seq.*